1

2

3

4

5

6

7

8                         UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   PHILLIP R. HERNANDEZ,                        No.  2:19-cv-2414 KJM DB P

12                    Petitioner,

13          v.                                    FINDINGS AND RECOMMENDATIONS

14   JOSIE GASTELO, Warden,

15                    Respondent.

16

17

18          Petitioner, a state prisoner, proceeds pro se with a petition for a writ of habeas corpus

19   under 28 U.S.C. § 2254. (ECF No. 3.) Petitioner challenges his 2015 conviction for first degree

20   murder. As filed, the petition asserted three grounds for relief, but petitioner has voluntarily

21   dismissed the unexhausted third ground for relief, asserting cumulative error. (See ECF Nos. 19-

22   21.) Petitioner now proceeds with grounds one and two of the petition, claiming (1) the trial court

23   violated his constitutional right to an impartial jury; and (2) the trial court erred in concluding he

24   did not invoke his Miranda[1] rights during an interview with a detective and in concluding that his

25   statements to the detective were voluntary. For the reasons set forth below, the petition should be

26   denied.

27

28   _____
     [1] Miranda v. Arizona, 384 U.S. 436 (1966).

                                                    1

1

**BACKGROUND**

2

**I.      Trial Evidence**

3

The California Court of Appeal for the Third Appellate District provided the following

4

summary of the evidence presented at trial:

5

6

7

8

9

10

11

12

> Defendant had custody of his two sons, P.H. and M.H., in the fall of
> 2012. At that time, defendant was working intermittently, living at
> his grandmother's house, and struggling with substance abuse.
> Defendant's ex-wife, who lived out of state, tried to get custody of
> the children at a November 2012 hearing. The judge denied her
> request. Defendant and his ex-wife had been on good terms before
> she tried to gain custody of the children, but the custody dispute led
> to a falling out. Defendant's ex-wife scheduled an ex parte hearing
> on December 6, 2012, and revealed defendant's substance abuse
> issues to the judge for the first time. She also contacted Child
> Protective Services on February 4, 2013, because she was concerned
> about the children's safety given defendant's substance abuse issues.
> Child Protective Services contacted defendant and helped him enroll
> in a drug treatment program, but did not remove the children.

13

14

15

16

17

18

> In late February 2013, defendant and his sons still lived with
> defendant's grandmother. The night of February 26, defendant broke
> through the sliding glass door in the back of the house and went into
> the "prayer room" where M.H. was sleeping. The crash from the
> breaking glass woke defendant's grandmother. She went into the
> "prayer room" and found defendant standing over M.H. She asked
> defendant, "What are you going to do?" Defendant responded, "I'm
> going to do what I have to do" and he struck M.H. on the head several
> times with a hatchet, killing him. Defendant stated to police that the
> murder gave his ex-wife a "pyrrhic victory;" i.e., a victory where the
> cost outweighs or negates the benefit. (Merriam-Webster's
> Collegiate Dict. (11th ed. 2006) p. 1015 col. 1.)

19

20

21

22

23

24

25

> Defendant left his grandmother's house through the back door and
> then left the property through the side yard. He walked or jogged
> around the neighborhood until he encountered two police officers
> who had been called to the crime scene. The officers walked toward
> defendant, who put his hands up as the officers approached. The
> officers handcuffed defendant and placed him in the back of their
> police car. They took defendant to the police station where he was
> interrogated. The detective who interviewed defendant advised him
> of his <u>Miranda</u> rights upon entering the interrogation room.
> Defendant confirmed he understood his rights and proceeded to
> answer questions. During the course of the four-hour interrogation,
> defendant confessed to the murder.

26

<u>People v. Hernandez</u>, No. C079250, 2018 WL 3566861, at *1 (Cal. Ct. App. July 25, 2018).

27

////

28

////

2

1    II.     **Procedural Background**

2            A.      **Trial and Judgment**

3            A jury convicted petitioner of first-degree murder. Hernandez, 2018 WL 3566861, at *1.

4    The trial court imposed a sentence of twenty-six years to life. (ECF No. 3 at 1.)

5            B.      **Subsequent Proceedings**

6            Petitioner appealed his conviction, raising the two grounds presented in this petition. The

7    California Court of Appeal rejected the claims and affirmed the judgment. Hernandez, 2018 WL

8    3566861, at *8. Petitioner sought review in the California Supreme Court. (ECF No. 26-13.) The

9    California Supreme Court denied review. (Id.)

10           The federal petition was filed on December 23, 2019. (ECF No. 3.) Respondent answered

11   the petition. (ECF No. 27.) Petitioner filed a traverse. (ECF No. 30.)

12           **STANDARDS OF REVIEW APPLICABLE TO HABEAS CORPUS CLAIMS**

13           An application for a writ of habeas corpus by a person in custody under a judgment of a

14   state court can be granted only for violations of the Constitution or laws of the United States. 28

15   U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or

16   application of state law. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502

17   U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

18           Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

19   corpus relief:

20           An application for a writ of habeas corpus on behalf of a person in
             custody pursuant to the judgment of a State court shall not be granted
21           with respect to any claim that was adjudicated on the merits in State
             court proceedings unless the adjudication of the claim –
22
              (1) resulted in a decision that was contrary to, or involved an
23           unreasonable application of, clearly established Federal law, as
             determined by the Supreme Court of the United States; or
24
             (2) resulted in a decision that was based on an unreasonable
25           determination of the facts in light of the evidence presented in the
             State court proceeding.
26

27           For purposes of applying § 2254(d)(1), "clearly established federal law" consists of

28   holdings of the United States Supreme Court at the time of the last reasoned state court decision.

1    Greene v. Fisher, 565 U.S. 34, 37 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011)

2    (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). Circuit court precedent "'may be

3    persuasive in determining what law is clearly established and whether a state court applied that

4    law unreasonably.'" Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th

5    Cir. 2010)). Circuit precedent may not, however, be used "to refine or sharpen a general principle

6    of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not

7    announced." Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (citing Parker v. Matthews, 567 U.S. 37

8    (2012)). Where courts of appeals have diverged in their treatment of an issue, it cannot be said

9    that there is "clearly established Federal law" governing that issue. Carey v. Musladin, 549 U.S.

10   70, 76-77 (2006).

11         A state court decision is "contrary to" clearly established federal law if it applies a rule

12   contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

13   precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003)

14   (quoting Williams, 529 U.S. at 405-06). "Under the 'unreasonable application' clause of §

15   2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct

16   governing legal principle from th[e] [Supreme] Court's decisions, but unreasonably applies that

17   principle to the facts of the prisoner's case.'" Lockyer v. Andrade, 538 U.S. 63, 75 (2003)

18   (quoting Williams, 529 U.S. at 413).

19         Under 28 U.S.C. § 2254(d)(1), "a federal habeas court may not issue the writ simply

20   because that court concludes in its independent judgment that the relevant state-court decision

21   applied clearly established federal law erroneously or incorrectly. Rather, that application must

22   also be unreasonable." Williams, 529 U.S. at 411; see also Schriro v. Landrigan, 550 U.S. 465,

23   473 (2007); Andrade, 538 U.S. at 75. "A state court's determination that a claim lacks merit

24   precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of

25   the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough

26   v. Alvarado, 541 U.S. 652, 664 (2004)).

27         There are two ways a petitioner may satisfy subsection (d)(2). Hibbler v. Benedetti, 693

28   F.3d 1140, 1146 (9th Cir. 2012). A petitioner may show the state court's findings of fact "were

                                                      4

1    not supported by substantial evidence in the state court record" or may challenge the fact-finding

2    process itself on the ground it was deficient in some material way. Id. (citing Taylor v. Maddox,

3    366 F.3d 992, 999-1001 (9th Cir. 2004)); see also Hurles v. Ryan, 752 F.3d 768, 790-91 (9th Cir.

4    2014). Under the "substantial evidence" test, the court asks whether "an appellate panel, applying

5    the normal standards of appellate review," could reasonably conclude that the finding is

6    supported by the record. Hibbler, 693 F.3d at 1146 (9th Cir. 2012). In order to find the state

7    court's fact-finding process to be insufficient, a federal court must "be satisfied that any appellate

8    court to whom the defect [in the state court's fact-finding process] is pointed out would be

9    unreasonable in holding that the state court's fact-finding process was adequate." Hibbler, 693

10   F.3d at 1146-47 (quoting Lambert v. Blodgett, 393 F.3d 943, 972 (9th Cir. 2004)).

11       If a petitioner overcomes one of the hurdles posed by section 2254(d), then this court

12   reviews the merits of the claim de novo. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir.

13   2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc). For claims upon

14   which a petitioner seeks to present evidence, the petitioner must meet the standards of 28 U.S.C.

15   § 2254(e)(2) by showing that he has not "failed to develop the factual basis of [the] claim in State

16   court proceedings" and by meeting the federal case law standards for the presentation of evidence

17   in a federal habeas proceeding. See Cullen v. Pinholster, 563 U.S. 170, 186 (2011).

18       This court looks to the last reasoned state court decision as the basis for the state court

19   judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

20   "When a federal claim has been presented to a state court and the state court has denied relief, it

21   may be presumed that the state court adjudicated the claim on the merits in the absence of any

22   indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This

23   presumption may be overcome by showing "there is reason to think some other explanation for

24   the state court's decision is more likely." Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797,

25   803 (1991)). Similarly, when a state court decision on a petitioner's claims rejects some claims

26   but does not expressly address a federal claim, a federal habeas court must presume, subject to

27   rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, 568 U.S. 289,

28   293 (2013). If it is clear a state court has not reached the merits of a petitioner's claim, then the

5

1    deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court

2    reviews the claim de novo. Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d 1099, 1109

3    (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

4                                          **ANALYSIS**

5    **I.       Right to an Impartial Jury**

6            Petitioner claims the trial court failed to conduct adequate and meaningful voir dire

7    inquiries to determine whether Juror No. 9 was actually biased because of pretrial exposure to

8    news reports that greatly affected him as well as his wife. (ECF No. 3 at 4.) Petitioner argues the

9    court erred in not disqualifying Juror No. 9 during voir dire and when questioning Juror No. 9

10   after the pathologist gave testimony that visibly upset Juror No. 9. (See id.)

11   **A.       Additional Background**

12           During the trial court's voir dire examination of prospective jurors, a
     prospective juror told the trial court that he possibly had prior
13   knowledge of defendant's case. The juror had seen a news report
     about defendant's crime on television two years prior to being called
14   for jury duty. He remembered that the victim was a young child who
     had been killed with a hatchet. The story made an "emotional
15   impact" because the juror had a young son who was the same age as
     the victim. The court and both attorneys examined the prospective
16   juror for bias, but neither attorney objected to the juror nor did the
     court find cause to exclude him from the jury. The court found the
17   juror was as "close to 100 percent sure as he possibly can be that he
     can rely solely and exclusively upon the evidence presented at trial"
18   and did not dismiss him.

19           During trial, this same juror (now sworn Juror No. 9) asked for a
     break from proceedings after listening to the pathologist's testimony
20   about M.H.'s autopsy. During the recess, defense counsel stated that
     Juror No. 9 "was glaring at me in a very angry manner ... yesterday."
21   He also thought the juror was too emotional to be fair and impartial,
     and asked the court to examine the juror for possible bias. The
22   prosecutor confirmed that defense counsel had voiced concerns over
     Juror No. 9's demeanor the day before, but said defense counsel had
23   been unsure whether Juror No. 9 was glaring at him or the prosecutor.

24           The court acknowledged that some of the jurors, including Juror No.
     9, had become justifiably emotional during the pathologist's
25   testimony, but decided not to ask whether Juror No. 9's emotions
     affected his impartiality. The court also declined to examine him on
26   whether he had been glaring at defense counsel because the court did
     not want to "alter what [the juror] otherwise would normally do."
27   The court agreed to ask Juror No. 9 whether he could still be fair,
     because fairness "is really the only issue we're talking about." The
28   court called Juror No. 9 into the courtroom and asked whether, "in

                                              6

1

2

3

4

> light of the fact" that the juror had seen television coverage of the murder before trial, the juror "could still be fair and impartial to both sides in the case." The juror affirmed he could still be fair and impartial, and both counsel declined to question him when the court provided an opportunity to do so. Defense counsel did not raise any further objections to Juror No. 9's presence on the jury.

5 Hernandez, 2018 WL 3566861, at *2.

6 **B.      Applicable Legal Standards**

7    The Sixth Amendment to the United States Constitution guarantees criminal defendants

8 the right to a trial by a fair and impartial jury. See Irvin v. Dowd, 366 U.S. 717, 722 (1961). The

9 right to a jury trial is extended to state criminal trials through the Due Process Clause of the

10 Fourteenth Amendment. Duncan v. Louisiana, 391 U.S. 145, 148-149 (1968). A criminal

11 defendant is entitled to a jury that reaches a verdict on the basis of evidence produced at trial.

12 Turner v. Louisiana, 379 U.S. 466, 472 (1965); Estrada v. Scribner, 512 F.3d 1227, 1238 (9th Cir.

13 2004). Voir dire examinations protect the right to a fair trial by exposing biases that could result

14 in a juror being excused for cause or by providing "hints of bias" that may assist a party in

15 exercising a peremptory challenge. McDonough Power Equipment, Inc. v. Greenwood, 464 U.S.

16 548, 554 (1984).

17    The Constitution lays down no particular tests to determine juror impartiality. United

18 States v. Wood, 299 U.S. 123, 145-46 (1936). It "does not dictate a catechism for voir dire, but

19 only that the defendant be afforded an impartial jury." Morgan v. Illinois, 504 U.S. 719, 729

20 (1992); see also Skilling v. United States, 561 U.S. 358, 386 (2010) ("No hard-and-fast formula

21 dictates the necessary depth or breadth of voir dire").

22    "Supreme Court case law in the area of juror bias is sparse." Williams v. Johnson, 840

23 F.3d 1006, 1010 (9th Cir. 2016). From a constitutional perspective, "we don't know precisely

24 what it means for a juror to be biased." Id. (citing Wood, 299 U.S. at 146). However, "we do

25 know that a juror is biased if he is unwilling to follow the law." Williams, 840 F.3d at 1010. The

26 partiality of an individual juror is an issue of historical fact: "did a juror swear that he could set

27 aside any opinion he might hold and decide the case on the evidence," and "should the juror's

28 protestation of impartiality have been believed." Patton v. Yount, 467 U.S. 1025, 1036-37 (1984).

1    A trial court's determination that a juror was impartial is entitled to a presumption of

2  correctness. See 28 U.S.C. § 2254(e); Yount, 467 U.S. at 1038; Tinsley v. Borg, 895 F.2d 520,

3  526 (9th Cir. 1990) (habeas courts accord a "'high measure of deference'" to state court factual

4  findings on juror impartiality) (citing Rushen v. Spain, 464 U.S. 114, 120 (1983)). When a

5  prospective juror expressly assures that he or she can set aside any preconceived opinions and

6  render a verdict based on the evidence, a presumption of impartiality attaches. Ybarra v.

7  McDaniel, 656 F.3d 984, 992 (9th Cir. 2011) (citing Murphy v. Florida, 421 U.S. 794, 800

8  (1975)); Irvin v. Dowd, 366 U.S. at 723. A defendant rebuts this presumption by demonstrating

9  the juror actually held a biased opinion. Ybarra, 656 F.3d at 992.

10    **C.    Review of the Last Reasoned State Court Decision**

11    The California Court of Appeal rejected petitioner's impartial juror claims, finding a

12  presumption of prejudice did not arise as to Juror No. 9, who was not actually biased, and that

13  petitioner forfeited his claim of error at pretrial voir dire. See Hernandez, 2018 WL 3566861, at

14  *2-6.

15    Under the procedural default doctrine, federal courts will not review a question of federal

16  law previously decided by a state court if the state court's decision rests on a state law ground that

17  is independent of federal law and adequate to support judgement. Coleman v. Thompson, 501

18  U.S. 722, 729 (1991). A state procedural rule is independent unless it appears "to rest primarily

19  on federal law or appears to be interwoven with federal law." Id. at 734. A state procedural rule is

20  adequate if it is "'firmly established and regularly followed' by the time as of which it is to be

21  applied." Ford v. Georgia, 498 U.S. 411, 424 (1991). The petitioner may only avoid default if he

22  can establish cause and prejudice, or that failure to consider the claim will result in a fundamental

23  miscarriage of justice. Coleman, 501 U.S. at 750.

24    The California Court of Appeal found that petitioner had forfeited his claim of error

25  concerning pretrial voir dire by failing to object at trial and additionally because defense counsel

26  had an opportunity to question Juror No. 9 before the jury was empaneled. Hernandez, 2018 WL

27  3566861, at *2. California's contemporaneous objection rule requires an objection at trial to

28  preserve the right to appeal. See Xiong v. Felker, 681 F.3d 1067, 1075 (9th Cir. 2012). The Ninth

8

1   Circuit has held that the contemporaneous objection rule is an independent and adequate state

2   ground and has applied it as a procedural bar to deny federal habeas claims. See, e.g., id.

3   Petitioner does not argue there is cause and prejudice or a fundamental miscarriage of justice. The

4   court finds no circumstances that would excuse the default. Thus, petitioner's claim is

5   procedurally barred to the extent it is based on alleged error at pretrial voir dire.

6        But even if this portion of the claim were not procedurally defaulted, it would be rejected

7   on the merits. Juror No. 9 stated during voir dire he did not think seeing the prior coverage would

8   affect him. (ECF No. 26-7 at 195, Augmented Reporter's Transcript.) Juror No. 9 indicated he

9   would rely on what he heard in court and decide the case based solely on the evidence introduced

10  in court. (Id. at 193-94, 196.) The court finds no indication that Juror No. 9 was unwilling to

11  follow the law. See Williams, 840 F.3d at 1010.

12       In rejecting the remainder of petitioner's juror impartiality claim on the merits, the court

13  of appeal found that Juror No. 9's knowledge of the crime from a media report combined with his

14  emotional reaction to the pathologist's testimony did not give rise to a presumption of prejudice:

15  
16  
17  
18  
    Juror No. 9 had heard of the case before, but there is no evidence that he introduced his knowledge into jury deliberations. In fact, he revealed his knowledge to the court during pretrial voir dire and repeatedly assured the court that he could set aside this information and consider the case impartially based only on the evidence introduced during trial. [Citation.]

19  
20  
21  
22  
23  
    Additionally, Juror No. 9 did not acquire his outside knowledge by reading media reports in violation of the trial court's admonition. He heard a media report before he was called as a juror. Possessing prior knowledge about a case on which one is called to serve as a juror cannot be misconduct. [….] It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." [Citation.] Here, Juror No. 9 said he could put his prior knowledge aside and impartially judge the case on the evidence admitted at trial. Thus, Juror No. 9's pretrial knowledge of defendant's case did not rise to a level of misconduct.

24  
25  
26  
27  
28  
    Neither did Juror No. 9's emotional reaction to the pathologist's testimony constitute juror misconduct creating a presumption of prejudice. Although Juror No. 9 requested a break after the pathologist's testimony and appeared to be emotional, the record does not support a reasonable inference Juror No. 9 committed misconduct. As the court noted, many jurors had emotional responses to the pathologist's testimony about M.H.'s traumatic and violent death. Further, "the jury is a 'fundamentally human' institution." [Citation.] Jurors are human beings and human beings react

emotionally to their experiences; the law does not expect jurors to remain unfeeling and unemotional during the presentation of evidence in trials, especially disturbing evidence showing a victim's condition after a traumatic event. [Here there was not a] failure to follow court admonitions or introduction of outside facts into deliberations. In this case, Juror No. 9 assured the court that he could be impartial. Absent evidence showing otherwise, there was no misconduct.

Hernandez, 2018 WL 3566861, at *4.

The court of appeal also rejected petitioner's claim that Juror No. 9 was actually biased and should have been disqualified:

As the court acknowledged, emotional reactions to the pathologist's testimony were "not unexpected"; multiple jurors reacted emotionally to the testimony. During the recess, Juror No. 9 said he was feeling better and just "felt a little warm." The trial court asked him whether "in light of the fact that you ... had seen some [television] coverage" he still felt he could be fair and impartial. The juror affirmed his prior knowledge of the case was not affecting his ability to objectively and impartially evaluate the evidence presented at trial. The record shows through Juror No. 9's responses that he was in control of his emotions and capable of making decisions based solely on the evidence. The trial court did not abuse its discretion by declining to inquire further about Juror No. 9's response to the pathologist's testimony.

Neither did defense counsel's statements to the trial court that Juror No. 9 was possibly glaring at him obligate the court to examine Juror No. 9 for potential bias. At trial, defense counsel told the prosecutor that he was unsure whether Juror No. 9 had been glaring at the prosecutor or defense counsel. Defendant's appellate counsel's argument that Juror No. 9 glared at defense counsel is pure speculation. Speculation is insufficient to trigger the court's obligation to inquire into potential juror bias. [Citation.]

Defendant further argues that, despite the court's "inadequate inquiry", the record affirmatively shows Juror No. 9 was actually biased based on the combination of the outside news report he saw prior to the trial and his emotional reaction to the pathologist's testimony. We disagree for the reasons stated, ante, regarding the outside news report and the alleged glaring.

Hernandez, 2018 WL 3566861, at *5-6.

The present federal petition fails to show that Juror No. 9 was actually biased based on prior exposure to media reports and an emotional reaction to the pathologist's testimony. See Ybarra, 656 F.3d at 992. Implicit in the trial court's finding of no juror misconduct is a finding that Juror No. 9 was credible when he indicated he could still be fair and impartial to both sides in

10

1   the case. See Hernandez, 2018 WL 3566861, at *2. The trial court's determination regarding

2   Juror No. 9's credibility is entitled to "special deference" and is presumed correct under 28

3   U.S.C. § 2254(e)(1). See Yount, 467 U.S. at 1038; Taylor v. Horn, 504 F.3d 416, 433 (3rd Cir.

4   2007) ("Implicit factual findings are presumed correct under § 2254(e)(1) to the same extent as

5   express factual findings."); Tinsley v. Borg, 895 F.2d at 525-26 (implicit factual finding entitled

6   to presumption of correctness).

7          This court's review of the of the trial transcript confirms that when asked by the court if

8   he could still be fair and impartial to both sides in the case, Juror No. 9 responded "I believe so."

9   (ECF No. 26-5 at 25, Reporter's Transcript, Vol. II. at 285.) Juror No. 9 responded in the negative

10  when asked whether what he saw before would impact his ability to receive the evidence and

11  evaluate it objectively. (Id.)

12         On this record, petitioner has not demonstrated Juror No. 9 actually held a biased opinion,

13  as is required to rebut the presumption of correctness of the trial court's finding. See Ybarra, 656

14  F.3d at 992. Instead, the essence of this claim asks the habeas court to second-guess the trial

15  court's finding regarding Juror No. 9's impartiality. This court will not do so, as the record

16  reasonably supports the trial court's findings that Juror No. 9 did not commit misconduct and that

17  Juror No. 9 was not actually biased. See Yount, 467 U.S. at 1038. Federal habeas relief is

18  unwarranted.

19         **II.     Miranda Rights**

20         Petitioner argues the trial court erred in finding he did not his invoke his Miranda rights

21  during a police interrogation with Detective Burke and by finding petitioner's statement was

22  knowing, intelligent, and voluntary. (ECF No. 3 at 4.) Petitioner argues he invoked his right to

23  remain silent on two occasions and additionally "pleaded the fifth" later in the interview. (Id.)

24         **A.      Additional Background**

25         At trial, defendant filed a motion in limine to exclude his confession.
            He argued the Miranda warning he received was inadequate, his
26         statement was involuntary, and he invoked his right to remain silent.
            The trial court found that the Miranda warning was adequate,
27         defendant's statement was voluntary, and defendant did not
            unambiguously assert his right to remain silent. Defendant's
28         confession was admitted into evidence except for a short

                                          11

conversation consisting of three lines of transcript about a urine sample that was excluded because of its potential prejudicial effect.

Hernandez, 2018 WL 3566861, at *1.

### B.      Applicable Legal Standards

Pursuant to the Fifth and Fourteenth Amendment privilege against self-incrimination, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda v. Arizona, 384 U.S. 436, 444 (1966). "Statements elicited in noncompliance with [the Miranda] rule may not be admitted for certain purposes in criminal trial." Stansbury v. California, 511 U.S. 318, 322 (1994) (per curiam).

The waiver of Miranda rights may be express or implied. See North Carolina v. Butler, 441 U.S. 369, 375-76 (1979). In deciding whether there was a valid waiver, courts consider the totality of the circumstances. Moran v. Burbine, 475 U.S. 412, 421 (1986). "The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Id. The waiver must also have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Id.

Once a suspect has expressly or impliedly waived Miranda rights, invocation of the right to remain silent or the right to counsel must be unambiguous and unequivocal. Berghuis v. Thompkins, 560 U.S. 370, 381-82 (2010). A suspect's "simple" and unambiguous statement that he wants to remain silent invokes the right to cut off questioning. Garcia v. Long, 808 F.3d 771, 781 (9th Cir. 2015) (quoting Thompkins, 560 U.S. at 382

### B.      Review of the Last Reasoned State Court Decision

The court of appeal found that petitioner impliedly waived his Miranda rights and did not, thereafter, invoke those rights, reasoning as follows:

A Sacramento police detective interviewed defendant on the morning of February 27, 2013. Upon entering the interrogation room, the detective informed defendant of his Miranda rights. Defendant confirmed he understood his rights. After reading defendant his rights, the detective proceeded with the interrogation. Defendant

12

answered questions about his name, date of birth, phone number, and address voluntarily, thus he impliedly waived his Miranda rights.

Defendant first argues he invoked his right to remain silent shortly after the interview began. After waiving his <u>Miranda</u> rights by answering questions about his name, birthday, address, and phone number, the detective asked defendant about his girlfriends and children. The parties dispute what defendant actually said at this point. [Based on] the video of the interview, defendant is seen mumbling with his head down, and it is not clear that he said he came up to talk to the detective. It is clear, however, that defendant said "I don't wanna talk. I just need to breathe." When looking at this exchange, and including the statement that defendant needed to breathe, it is clear defendant was not invoking his right to remain silent but was asking for some time to gather his thoughts.

In fact, the detective honored defendant's request. In response to defendant's statement that he did not want to talk and needed to breathe, the detective says, "take your time, man. Take your time." Approximately two minutes of silence then follows before the detective says to defendant, "I'll tell you right now, I'm coming in the situation late.... Um, and my job is here to understand you, okay? I'm not-I'm not your enemy." Defendant replies "I know," and continues talking with the detective about his mental health history.

During this interaction, defendant responds slowly in a quiet voice with his head down, and rocks back and forth slightly. Given defendant's demeanor and his mumbled statements following "I don't wanna talk," including the statement "I just need to breathe," a reasonable officer under the circumstances would assume defendant wanted to avoid thinking or talking about his actions at that moment, not that defendant was trying to invoke his right to silence. [Citation.] Having already waived his Miranda rights by answering the detective's questions, defendant faced the rather "heavy burden" of clearly and unambiguously asserting his right to remain silent in the face of further questioning, which he did not. [Citation.]

Defendant argues his statements following this back and forth should also be suppressed because they were involuntarily coerced by the detective's promise that they would be used to establish a mental health defense. After allowing defendant time to gather his thoughts, the detective said, "[W]hat I really wanna do is-is try and understand you and try and help others understand you, okay?" Defendant responded, "Um, so, it's-I wish I was sick. I-I don't know what's wrong with me." A couple of minutes later, the detective said, "So-well, like I said, or-or one thing we can do is you can help me understand you. And I'm gonna have to relay that to others so that other people can have some kinda understanding of, like you said, you know, you—you must be sick, or there's something wrong, okay?"

A statement is involuntary when "'it was elicited by any promise of benefit or leniency whether express or implied.'" [Citation.] According to defendant, "the reasonable inference from the detective's repeated pleas for information was his representation that

13

[defendant's] statement could help minimize his culpability by helping others find that there was indeed 'something wrong' with him." Defendant's interpretation of the detective's statements is not supported by the record. The detective interviewing defendant made no representation that defendant's conduct would be excused depending on his explanation. The detective said defendant could help the detective and others understand the defendant, not that creating understanding would lead to leniency. At no time did the detective imply leniency would result if defendant helped the detective and others understand him. Defendant's statements were therefore voluntary.

Following this and a 34-minute discussion of defendant's mental health and life's philosophy, the detective broached the subject of defendant's actions immediately before the murder. The detective said, "So you go to your uncle's. And then he takes you home. Can you take me through what happened from the time he dropped you off?" Defendant replies by saying, "I just gotta leave it at that" and "I don't wanna go there." When saying this, defendant appears weepy and upset and also said he wished he could take back his actions. These statements are simply too ambiguous to invoke defendant's right to remain silent and foreclose questioning. The statements are just as likely to be expressions of frustration with the interrogation or shame concerning certain topics as they are assertions that he did not want to talk. [Citation.] Because these statements were ambiguous, a reasonable officer would not assume defendant was invoking his right to remain silent.

Defendant then told the detective he was feeling "[p]ain, pure pain" the night of the murder and then admitted to using a hatchet to hit M.H. in the head two or three times. The detective then asked defendant about the reasons he (defendant) was required to undergo urine testing and whether he used drug-free urine from other people to pass the tests. When the detective asked defendant if he had used M.H.'s urine to pass his drug test, defendant replied, "Mm, no, I [plead] the fifth, uh, uh." The detective then stopped questioning defendant about this incident. At this point, one hour into the interrogation, defendant appears more relaxed than when he was discussing the murder. He is leaning back and clearly states, "I plead the fifth."

As the People concede, defendant invoked his right to remain silent to some extent here. However, the People's argument about the limited scope of defendant's invocation is persuasive. Defendant makes this statement in response to a particularly narrow question concerning the source of drug-free urine he used to pass drug tests. A reasonable officer in these circumstances would assume defendant did not want to talk to police about this subject. In fact, the detective immediately stopped asking defendant about his source of drug-free urine and moved on to other subjects. [D]efendant here is refusing to talk only about obtaining a urine sample from M.H. Accordingly, defendant did not unequivocally assert his right to remain silent, so

////

14

1
the detective was not required to end the interrogation at this point
either. Defendant's motion to suppress was properly denied.

2

3   Hernandez, 2018 WL 3566861, at \*6-8.

4        As the state court recognized, it is clear that petitioner impliedly waived his Miranda

5   rights at the outset of the interrogation. Thereafter, the detective questioned petitioner for some

6   time before petitioner claims to have made any invocation of his right to silence. At that point,

7   any invocation of petitioner's right to silence had to be clear and unambiguous. See Thompkins,

8   560 U.S. at 382.

9        The state appellate court reasonably found petitioner did not invoke his right to remain

10  silent when he asked for time to breathe and gather his thoughts. Based on the court's viewing of

11  the lodged recording of the interview, petitioner is clearly heard to ask for time to gather his

12  thoughts, which he was immediately given. Petitioner did not unambiguously indicate he did not

13  want to talk with the detective or that he wanted to remain silent.

14       Further into the interview, the detective asked petitioner to "take me through what

15  happened from the time [your uncle] dropped you off" and petitioner responded, "I just gotta

16  leave it at that" and "I don't wanna go there." See Hernandez, 2018 WL 3566861, at \*6. These

17  statements were also ambiguous. The state court reasonably found these statements were "likely

18  to be expressions of frustration with the interrogation or shame concerning certain topics" based

19  on overall context. Petitioner did not unambiguously indicate that that he did not want to talk

20  further or that he wanted to remain silent.

21       When, much later, petitioner stated he wanted to "plead the fifth," those statements were

22  very clearly responsive to the line of questioning about the source of urine used to pass drug tests.

23  "A suspect may remain selectively silent by answering some questions and then refusing to

24  answer others[.]" Hurd v. Terhune, 619 F.3d 1080, 1087 (2010). The state court reasonably

25  concluded petitioner did not invoke his right to remain silent as to any other subject based on

26  "pleading the fifth" solely in response to questions about how petitioner passed his drug tests.

27       Finally, the state appellate court also reasonably found that petitioner's statements were

28  not rendered involuntary by anything the detective said to petitioner. In encouraging petitioner to

15

1   talk about his mental health, the detective made statements like "my job is here to understand

2   you" and "I'm not your enemy." Hernandez, 2018 WL 3566861, at *6. The detective's statements

3   to petitioner were not the type of coercive action that could have overborne petitioner's will so as

4   to render his responses involuntary. See Amaya-Ruiz v. Stewart, 121 F.3d 486, 494 (9th Cir.

5   1997) (encouraging suspect to tell the truth does not amount to coercion), overruled on other

6   grounds by United States v. Preston, 751 F.3d 1008 (9th Cir. 2014) (en banc).

7          Even a promise to recommend leniency, or speculation that cooperation will have a

8   positive effect, does not render a defendant's statements involuntary. See United States v.

9   Guerrero, 847 F.2d 1363, 1366-67 (9th Cir. 1988) (indications of possible leniency for

10   cooperation were not coercive where no tangible benefit was promised); Juan H. v. Allen, 408

11   F.3d 1262, 1273 (9th Cir. 2005) (police statements that a "cooperative attitude" would be

12   beneficial did not constitute coercion). Thus, here, none of the detective's statements urging

13   petitioner to tell his story amounted to coercive conduct. The state courts' determination that no

14   Miranda violation occurred during the interrogation must stand.

15          The court has examined the claimed invocations of petitioner's Miranda rights and found

16   petitioner did not make an unequivocal invocation. There is, further, no merit to petitioner's claim

17   that his statements to the detective were not knowing, intelligent, and voluntary. But even if

18   petitioner's statements to the detective had been erroneously admitted, the error cannot be said to

19   have had a substantial and injurious effect on the jury's verdict in this instance. See Brecht v.

20   Abrahamson, 507 U.S. 619, 637 (1993); Garcia, 808 F.3d at 781. There was overwhelming,

21   independent evidence introduced against petitioner at trial, which included the testimony of his

22   grandmother, who saw him commit the offense. See Hernandez, 2018 WL 3566861, at *2.

**CONCLUSION**

24          Petitioner fails to meet the standards set out in 28 U.S.C. § 2254(d) by showing the state

25   court rejection of his claim was contrary to or an unreasonable application of clearly established

26   law as determined by the Supreme Court, or that it resulted in a decision based on an

27   unreasonable determination of the facts.

28   ////

16

1      In accordance with the above, IT IS RECOMMENDED the petition for a writ of habeas

2  corpus (ECF No. 3) be denied.

3      These findings and recommendations will be submitted to the United States District Judge

4  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 30 days after

5  being served with these findings and recommendations, any party may file written objections with

6  the court and serve a copy on all parties. The document should be captioned "Objections to

7  Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served

8  on all parties and filed with the court within 7 days after service of the objections. Failure to file

9  objections within the specified time may waive the right to appeal the District Court's order.

10  Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir.

11  1991). In the objections, the party may address whether a certificate of appealability should issue

12  in the event an appeal of the judgment in this case is filed. See Rule 11, Rules Governing § 2254

13  Cases (the district court must issue or deny a certificate of appealability when it enters a final

14  order adverse to the applicant).

15  Dated:  August 29, 2023

16

17

DLB7
18  hern2414.fr

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

19

20

21

22

23

24

25

26

27

28

17